JSCH JEMC
Case 3:22-mj-03387-AHG   Document 1   Filed 09/15/22   PageID.1   Page 1 of 14
AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Red Apple iPhone SE
Seized as FP&F No. 2022565500046501 Item 0002
("Target Device")

Case No. '22 MJ3387

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U.S.C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Giancarlo Lugo, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Giancarlo Lugo, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone  *(specify reliable electronic means)*.

Date: 09/15/2022

*Judge's signature*

City and state: San Diego, California    HON. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Giancarlo Lugo, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

> Red Apple iPhone SE
> Seized as FP&F No. 2022565500046501 Item 0002
> (**"Target Device"**)

(**"Target Device"**), as further described in Attachment A, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant related to the investigation and prosecution of Lucio Josue CASTRO for transporting and moving illegal aliens within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2008 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of

1

Criminal Procedure and have been a Federal Law Enforcement Officer for fourteen years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit,

providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications,

3

photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On September 14, 2022, Border Patrol Agent A. Cherry and L. Waters were assigned to perform their assigned duties in Campo Border Patrol Station's area of

4

responsibility. Agent Cherry and Agent Waters were both wearing their agency issues full rough duty uniform with all patches and insignia visible. Agent Cherry was operating an unmarked Border Patrol vehicle with fully functioning lights and sirens. Agent Waters was operating a fully marked Border Patrol vehicle with fully functioning lights and sirens.

12. At approximately 8:03 AM, Agent Cherry was patrolling approximately two miles north of the United States/Mexico International Boundary near State Route 94 (SR-94) near Forrest Gate Road. Forrest Gate Road connects SR-94 directly with the United States and Mexico International Boundary. Agent Cherry observed a blue Nissan Versa and conducted record checks. Record Checks revealed that the Nissan was currently registered out of Lynwood, California and had no prior travel history in the Campo Border Station's area of responsibility. This indicates the Nissan is not operated by a daily or common traveler in the Campo Border Patrol Station's area of responsibility.

13. Agent Cherry followed the Nissan on SR-94 into an area known to Border Patrol Agents as "The Campo Creek Vineyards". Agent Cherry was able to observe that the vehicle was being occupied only by the driver. "The Campo Creek Vineyards" is approximately a quarter of a mile north from the United States/Mexico International Boundary. It is a location known to be commonly utilized by alien smugglers as a meet up place with individuals attempting to illegally enter the United States due to its short proximity to the border and various access roads from the border.

14. Agent Cherry requested assistance from a marked patrol unit to assist on a vehicle stop. Agent Waters responded and notified that he was located at the intersection of SR-94 and Forest Gate Road. The Nissan drove back out of "The Campo Creek Vineyards" and then traveled towards Agent Waters' position. Agent Waters positioned himself behind the vehicle as it continued to travel eastbound on SR-94. Agent Waters observed an individual the backseats of the Nissan that was attempting to conceal himself by laying down in the backseats.

15. Agent Waters activated his lights and siren and attempted to initiate a vehicle stop on SR-94 near Sheridan Road. The Nissan continued to travel eastbound on SR-94. The Nissan turned on its right turn signal as if it were going to pull over on the side of the road but never pulled over and continued to travel eastbound on SR-94. The Nissan drove past various locations SR-94 that could have been utilized for it to safely pull over. Agent Waters made attempts to utilize his vehicle's loudspeaker system to command the Nissan to pull over. The Nissan continued its course of travel ignoring commands from Agent Waters. Agent Waters advised over agency radio that the Nissan failed to yield. Agent Cherry took over agency radio communications and informed that the Nissan was traveling approximately 50 miles per hour.

16. After approximately two miles, the Nissan pulled over west of the intersection of La Posta Road and SR-94. Agent Cherry and Agent Waters approached the Nissan and instructed the driver, later identified as defendant Lucio Josue CASTRO, to turn off the engine and exit the vehicle. CASTRO was instructed to put his hands behind his head and walk backwards toward the agents. Agent Waters and Agent Cherry observed CASTRO reach back into his vehicle through the window side. CASTRO was ordered to stop reaching inside the vehicle. CASTRO was immediately handcuffed and detained in a Border Patrol vehicle by Agent Waters.

17. Agent Cherry approached the Nissan and observed two passengers inside. One passenger was laid down in the backseat and the other passenger was in the front seat with the seat folded back attempting to conceal themselves from the agents. Agent Cherry conducted an immigration inspection on the two passengers, later identified as material witnesses Omar LOPEZ-Perez and Gilberto PACHECO-Martinez. LOPEZ and PACHECO stated that they are citizens of Mexico without immigration documents allowing them to enter the United States legally.

18. At approximately 8:21 AM, Agent Cherry placed LOPEZ and PACHECO under arrest. Agent Cherry then walked toward the vehicle where CASTRO was being

detained and placed him under arrest. The arrest location was approximately 3.5 miles north of the United States/Mexico International Boundary and approximately 12 miles northeast of the Tecate, California Port of Entry.

19. At the time of arrest, a red Apple iPhone SE **(Target Device)**, belonging to the defendant, CASTRO, was found in the center console of the Nissan, plugged into the charging port. CASTRO claimed the phone as his property. This device was subsequently seized.

20. The defendant Lucio CASTRO was read his Miranda rights. CASTRO stated he understood his rights and was willing to give a statement without an attorney present. CASTRO stated that while at a gas station in Lynwood, California, he was approached by a tall, dark skinned, Hispanic male with short hair that offered CASTRO $200 dollars to pick up some illegal aliens in San Diego and drive them to an undisclosed location in Anaheim, California. CASTRO stated that he left Lynwood at approximately 11:00 PM the night before his event. CASTRO stated that he drove to El Cajon, California and waited until the morning for further instructions.

21. CASTRO stated he received a text message which included a pin drop of the location of the illegal aliens. The unknown individual instructed him to drive to the location and honk his horn twice. CASTRO stated once he arrived at the pickup location, he saw two individuals running out of the brush toward his vehicle and they got in. CASTRO stated he was instructed to go to the Golden Acorn Casino. CASTRO stated that when he was confronted by Border Patrol agents he got scared and decided to not pull over. He stated that he finally pulled over and was afraid.

22. Material witnesses, Omar LOPEZ-Perez and Gilberto PACHECO stated that they are citizens of Mexico without immigration documents allowing them to enter or remain in the United States legally. LOPEZ stated that a friend of his made arrangements with an unknown smuggler. PACHECO stated that his sister agreed to pay an unknown

smuggler for his smuggling fees. LOPEZ and PACHECO stated that they both crossed the International Boundary through a part of the border where there was no fence.

23. LOPEZ stated that a friend showed him the route to take on a map with an specific location near a ranch off Highway 94 where they were to be picked up in a vehicle described to him by the smuggler as a blue Nissan Versa. LOPEZ stated that they arrived at the predetermined location in the early morning of September 14, 2022 and hid in the brush near Highway 94. LOPEZ stated that a few hours later the blue Nissan Versa stopped near their location and picked them up. LOPEZ stated once he got in the car, he laid down in the rear passenger seat and fell asleep and only remembers waking up to Border Patrol agents opening the door.

24. PACHECO stated that LOPEZ received guidance via mobile phone. PACHECO stated that they walked for approximately 12 hours until they arrived at the arranged location. PACHECO stated that LOPEZ then contacted the smugglers over the phone and that the smugglers advised LOPEZ that a blue Nissan Versa would pick them up shortly. PACHECO stated that eventually the blue Nissan Versa pulled up to their location and came to a full stop. PACHECO stated that he then got in the Nissan and sat in the front passenger seat while LOPEZ sat in the rear passenger seat. PACHECO stated that the defendant, CASTRO, made small talk and that about twenty minutes later the Border Patrol apprehended them. When shown a photographic lineup, Both LOPEZ and PACHECO identified CASTRO as the driver of the blue Nissan Versa.

25. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that defendant Lucio Josue CASTRO was using the **Target Device** to communicate with others to further illegal entry

8

into the United States. Based on my training and experience, it is also not unusual for individuals, such as the defendant CASTRO, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search **Target Device** for data beginning on **August 14, 2022, through September 14, 2022**.

## METHODOLOGY

26. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days from the date this warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

29. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

30. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

31. Because the **Target Device** was seized at the time CASTRO's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on **Target Device**. As stated above, I believe that the appropriate date range for this search is from **August 14, 2022, through September 14, 2022.**

Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A and seize the item listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Giancarlo Lugo
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __15th__ day of September, 2022.

Hon. Allison H. Goddard
United States Magistrate Judge

# ATTACHMENT A
## PROPERTY TO BE SEARCHED

The following property is to be searched:

Red Apple iPhone SE
Seized as FP&F No. 2022565500046501 Item 0002
("**Target Device**")

The Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

# ATTACHMENT B

## ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **August 14, 2022, through September 14, 2022**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

13